176 N.J. Super. 378 (1980)
423 A.2d 655
ALONZO W. LAWRENCE AND JAMES SIMPSON, PLAINTIFFS-RESPONDENTS,
v.
BAUER PUBLISHING & PRINTING LTD., A CORPORATION, KURT CHRISTOPHER BAUER, JEFFREY LANCE BAUER AND PATSY BONTEMPO, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 15, 1980.
Decided November 14, 1980.
*384 Before Judges FRITZ, POLOW and JOELSON.
J. Roger Conant argued the cause for appellants (Conant and McCreedy attorneys).
Paul R. Williams, Jr. argued the cause for respondents (Williams & Flynn attorneys; Harry Green, of counsel; Paul R. Williams, Jr., on the brief).
The opinion of the court was delivered by POLOW, J.A.D.
Plaintiffs Lawrence and Simpson sought damages for libel against the corporate owner, the editor, the publisher and a reporter of the Rahway-News Record. When all of the evidence had been presented the trial judge granted a defense motion to dismiss Lawrence's claims based upon a determination that he was a "public figure." Thereafter, the jury returned a verdict of $22,500 in favor of Simpson against all defendants except the reporter.[1] On Lawrence's subsequent motion the dismissal of his complaint was set aside by the trial judge and a new trial ordered thereon. Defendants' motion for a new trial with respect to the verdict for plaintiff Simpson was denied.
On appeal defendants demand that the verdict and judgment in favor of Simpson be reversed, that the new trial ordered for Lawrence be set aside and that all claims by both plaintiffs be dismissed.
*385 Lawrence and Simpson were charter members of the Rahway Taxpayers Association. Lawrence had served as president since its inception in 1965 and in that capacity expressed opinions publicly on numerous issues of concern to local taxpayers. He regularly attended city council and other local agency meetings and frequently acted as spokesman for the Association. Pursuant to his request, he received notice of special meetings.
Simpson was also an officer of the Association in 1974 and 1975 when the allegedly libelous articles were published and the activities which provoked them took place. He also attended most of the city council meetings and periodically spoke on public issues. Over the years he has written letters to the editor of local newspapers on a variety of subjects.
In 1974, Lawrence, as Association president, led a petition campaign seeking to defeat a proposed $100,000 increase in local appropriations to finance a new firehouse. Both Lawrence and Simpson and a number of other volunteers actively collected signatures in an attempt to satisfy the statutory prerequisite for a referendum on the issue.
In late December 1974 plaintiffs submitted their petitions to the city clerk. On January 3, 1975 the city clerk advised plaintiffs by letter that the petitions were invalid. On January 9, 1975 the first of the offensive articles appeared on the front page of defendants' weekly newspaper.
The two-line headline, in bold type, stretching across the entire front page announced:
City attorney rules association petitions improper: forgery charges may loom for Lawrence, Simpson
The newspaper article further particularized the charges against Lawrence and Simpson in the following first four paragraphs:
In separate actions city attorney Alan Karcher ruled the petitions filed by the officials of the Rahway Taxpayers Association are improper and attorney Theodore J. Romankow was asked to take action by city officials against association leaders because of "irregularities" in the petitions.
The Rahway News-Record learned Mr. Romankow was empowered to handle a case against Alonzo W. Lawrence, president of the association, and James Simpson, the group's secretary-treasurer.

*386 The City's case would be based on charges that forgery was involved in the gathering of approximately 5,000 signatures which the two men filed with city clerk Robert W. Schrof on December 27, The News-Record was told.
In connection with this the men would also be charged with false swearing of oaths and affidavits, it was asserted.
Because of their concern about the effect of such an attack on their personal integrity, plaintiffs consulted counsel. Shortly thereafter a written demand for retraction was submitted, in response to which another article was published by defendants on April 17, 1975. It is also attacked as defamatory in plaintiffs' libel action. The headline proclaimed: "News-Record asked to retract article on firehouse battle." After noting the demand for retraction, the story repeated the January 9 assertion that the newspaper had been told "by a source in the administration" that the petitions had been turned over to the local prosecutor for investigation of allegations of forgery and false swearing. This time the story emphasized that the paper had been "careful to note it was told or it learned or it was asserted." However, it continued to insist that the staff reporter "accurately interpreted what was told to him...." The newspaper also asserted that its comments were based on statements made by others and that it did not, in fact, accuse the men of guilt of the allegations which were under investigation by the local prosecutor.
Although the possibility of "forgeries" was a concern of the municipal officials, in fact, testimony of witnesses called by defendants compels the conclusion that plaintiffs were never accused by any municipal or other official of having committed forgery or false swearing.
During the trial plaintiffs produced witnesses who testified that the articles cast doubt on the characters and reputations of Simpson and Lawrence and that, in the opinion of those witnesses, the newspaper stories meant that plaintiffs had committed forgery.
The January 9 article was written by defendant Patsy Bontempo who, at trial, identified as his primary sources of information, municipal prosecutor Theodore J. Romankow and city *387 business administrator Joseph Hartnett. Hartnett was knowledgeable about goings-on in the city and had been a routine source of information for the reporter. According to Bontempo, Hartnett had advised him by telephone that plaintiffs were under investigation by the county prosecutor for forgeries of signatures on the petitions. The testimony of Romankow and Hartnett, witnesses called by defendants, clearly demonstrates that the reporter misinterpreted their comments.
Defendant Kurt Bauer, who provided background information for the January 9 story, holds 99% of the stock of the corporation which owns the newspaper. He was personally familiar with plaintiffs from their appearances at council meetings and also was aware of the sources of information for the article in question. He had personal knowledge of the issue and people involved. He testified that Hartnett had told him that the petitions were under investigation for forgery and false swearing, but he could not specifically recall whether Lawrence and Simpson were personally identified as targets of the investigation.
Upon receiving the demand for retraction, Bauer discussed the matter with Hartnett again and submitted a draft of the April 17 article to the city prosecutor for written comment. The prosecutor responded that he had been requested to investigate allegations of forgery and false swearing in the petitions circulated by the Rahway Taxpayers Association "whose leaders include Alonzo W. Lawrence and James Simpson." Thereupon, Bauer published his April 17 article which proclaimed that the information contained in the January 9 story had been accurately reported.
The city prosecutor testified that he did not intend his letter to suggest that plaintiffs were under investigation. City business administrator Hartnett testified that although he believed there were irregularities in the gathering of signatures on the petitions, nevertheless, he never told anyone associated with the newspaper that plaintiffs themselves committed or were under *388 investigation for committing any crime. Specifically, Hartnett denied telling Bauer or Bontempo that plaintiffs individually were under investigation. Furthermore, according to Hartnett, when he was shown Bauer's proposed story draft prior to the April 17 publication, he informed Bauer that he had not suggested that there were charges against plaintiffs themselves.
After the testimony had been completed, defendants renewed applications for dismissal of the complaints. Based upon all of the evidence, the trial judge concluded that Lawrence, as the Association's leader, was a "public figure" and dismissed his complaint as against all defendants. On the other hand, Simpson was determined not to have been a "public figure" and the motion to dismiss his complaint was denied. The jury returned a final verdict in Simpson's favor in the sum of $22,500 against the corporate owner, the publisher and the editor. The jury found no cause of action as against defendant Bontempo, the reporter who had written the original story.
Upon subsequent applications by both sides, the judge reiterated his determination of Lawrence's status as a "public figure." However, the dismissal was vacated and a new trial ordered to allow a determination by the jury of whether the offensive statements were made against Lawrence, as a public figure, with knowledge of their falsity or with reckless disregard for the truth. Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). On appeal defendants seek reversal of the judgment in favor of Simpson and dismissal of all demands made by both plaintiffs.
Prior to trial, affirmative defenses based on truth were rejected since defendants were unable to provide proof that plaintiffs were actually guilty of the crimes of forgery and false swearing. Hence, defense counsel was directed not to argue in his opening statement that literal truth of the articles' contents constitutes a complete defense although he was permitted to argue that the facts in the article were true. On appeal defendants continue to insist that the simple assertion that *389 "forgery charges may loom for Lawrence [and] Simpson" was literally true. Thus, it is argued that the defense of truth is available. We reject this contention.
It is not significant that defendants used the qualified "charges may loom" rather than the unconditional "charges have been made" or "will be made." The capacity to destroy reputations is equally great. See Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 390 (1959) (Weintraub, C.J., dissenting). The sting of an accusation may be more pervasive when made by insinuation. Insinuations may thus be more "mischievous" than direct assertions. Cross v. Guy Gannett Pub. Co., 151 Me. 491, 121 A.2d 355 (Sup.Ct. 1956).
Nor may defendants shield themselves from liability by literally relying on other sources. Rogers v. Courier Post Co., 2 N.J. 393, 401 (1949). In Rogers the libelous comment was contained in a quote from a third person attributing disreputable and degrading conduct to the injured party. The defense of truth and fair comment was rejected based upon the general rule that accurate repetition of libelous statements by others is not per se justifiable. Ibid.
Surrounding the defamatory sting of their words with terms such as "reportedly," "may be," or "could possibly be" will not protect a publisher. Any other interpretation of the defense of "truth" would provide publishers with a cloak of immunity in the publication of rumor, gossip and malicious insinuations without responsibility for the consequent damages inflicted by the mere repetition in headlines of undocumented accusations.
We are, therefore, entirely satisfied that a publisher of a statement which is defamatory by suggestion or insinuation, must, in order to present an adequate defense, prove more than that the article was literally true. That the information was received from another source is not enough. To sufficiently develop the defense of truth under the facts of this case, defendants must show that plaintiffs had in fact committed the *390 offenses or that they had been formally charged with criminal conduct or that police or county prosecuting authorities had announced an official investigation of plaintiffs for the offenses described in the articles.[2]See Rogers v. Courier Post Co., supra, 2 N.J. at 399.
The trial judge imposed the more stringent requirement upon defendants that in order to avail themselves of the defense of truth, they must prove actual guilt of forgery or false swearing. Nevertheless, in this case the defense of truth was not available even under the less demanding test described above. The trial judge correctly determined that the defense of truth requires more than just a showing that the offensive statements were an accurate repetition of words spoken by a third person and that the "defamatory sting" rather than the literal meaning of the words must be proven true. Therefore, we find that the judge's action in striking the defense of truth was not inappropriate. See Rogers v. Courier Post Co., supra at 401.
The trial judge ruled, as a matter of law, that the April 17, 1975 article was not a retraction. We agree. A retraction can only be effected if it is full and unequivocal and free of insinuations and "hesitant withdrawals." Brogan v. Passaic Daily News, 22 N.J. 139, 147 (1956). It must be a sincere effort to repair all the wrong done by the defamatory article. Ibid. The April 17, 1975 article contains no effort to repair the harm done by the defamatory insinuations and, in fact, repeats those insinuations by reference to the previous article.
Defendants were properly foreclosed from reliance on the "defense of fair comment" since the defense of "truth" was *391 not available. The very reasons justifying rejection of the "truth" defense require denial of "fair comment" as a substitute therefor.
In a word, "fair comment" (a) must be based on facts truly stated, and (b) must not contain imputations of corrupt or dishonourable motives on the person whose conduct or work is criticised, save in so far as such imputations are warranted by the facts, and (c) must be the honest expression of the writer's real opinion; and if the comment complies with these conditions, it is fair comment, .... [Leers v. Green, 24 N.J. 239, 254-255 (1957)]
Moreover, fair comment "`cannot be used as a cloak for mere invective, nor for personal imputations not arising out of the subject-matter or not based on fact'...." Id. at 255. See Dressler v. Mayer, 22 N.J. Super. 129, 134 (App.Div. 1952). Hence, defendants went beyond the sphere of fair comment. Their insinuations were not based upon the facts as they knew or should have known them.
Defendants also contend that it was error for the judge to instruct the jury that both articles were libelous as a matter of law. They point to some authority holding statements actionable per se and some holding to the contrary, and conclude that an article is not libelous per se unless it suggests that the subject may be "guilty of" rather than merely "charged with" a crime. We disagree.
A writing is defamatory as a matter of law when the words sued upon suggest the commission of a crime. Dijkstra v. Westerink, 168 N.J. Super. 128, 133 (App.Div. 1979), certif. den. 81 N.J. 329 (1979). Cf. Herrmann v. Newark Morning Ledger Co., 48 N.J. Super. 420, 430 (App.Div. 1958). In Garven v. Finch, 97 N.J.L. 329 (E. & A. 1922), the following allegedly defamatory article appeared in a newspaper:
"`I refer to [the plaintiff] having accepted in 1918 $5,000 of Public Service money which was the Hudson county allotment of the Public Service's contribution to Edge's senatorial campaign fund.'" [at 329]
The court held the offending language libelous per se. It was reasoned that whenever words sound to the disreputation of the plaintiff, "they are defamatory on their face and actionable per se." Id. at 331.
*392 In Herrmann v. Newark Morning Ledger Co., supra, the following language was used:
"LABOR EDITOR FACES QUIZ BY UNION
........
It's all being kept very hush-hush, but according to very reliable sources Lewis M. Hermann, labor paper editor, will be called on the carpet at a special meeting of ITU Local 103 here this week to explain how he obtained the credentials he presented as a delegate at the State Federation of Labor convention in Atlantic City last week.
While the same observers regard the move with some skepticism because of the long record in local labor circles of the new 103 president's Richard Ryan, Jr., as a super-progressive, they insist it is designed to add to the embarrassment Hermann already feels as a result of a speech at the convention." [48 N.J. Super. at 426]
Though the article did not accuse plaintiff of illegality, it was held libelous per se because it cast doubt on plaintiff's reputation in the business community. Herrmann v. Newark Morning Ledger Co., supra at 430-431. Construing the article "according to the fair and natural meaning which will be given" to it by people of ordinary intelligence, Dressler v. Mayer, supra, 22 N.J. Super. at 135, the article was held to subject plaintiff "`to a loss of the good will and confidence entertained towards him by others'...." Herrmann v. Newark Morning Ledger Co., supra, 48 N.J. Super. at 431. See, also, Cross v. Guy Gannett Pub. Co., supra; Lancour v. Herald & Globe Ass'n, 111 Vt. 371, 17 A.2d 253 (Sup.Ct. 1941); Crane v. New York World Telegram Corp., 308 N.Y. 470, 126 N.E.2d 753 (Ct.App. 1955). Accord, Lambert v. Providence Journal Co., 508 F.2d 656 (1 Cir.1975), cert. den. 423 U.S. 828, 96 S.Ct. 45, 46 L.Ed.2d 45 (1975); Dressler v. Mayer, supra; Belli v. Orlando Daily Newspapers, Inc., 389 F.2d 579 (5 Cir.1968), cert. den. 393 U.S. 825, 89 S.Ct. 88, 21 L.Ed.2d 96 (1968).
It is for the judge to decide in the first instance whether a writing when read and construed could be defamatory. Leers v. Green, supra, 24 N.J. at 255. In those instances in which a publication is not reasonably susceptible of a nondefamatory *393 meaning, the judge should rule the publication defamatory per se. Washington Post Co. v. Chaloner, 250 U.S. 290, 293, 39 S.Ct. 448, 63 L.Ed. 987 (1919); Belli v. Orlando Daily Newspapers, Inc., supra, 389 F.2d at 583; Herrmann v. Newark Morning Ledger Co., supra, 48 N.J. Super. at 430. We are satisfied that the ruling of the trial judge in this case, that the publications are libelous per se, is fully justified by the facts and that, within the context of the circumstances of their publication, he properly found that they were not susceptible of a nondefamatory meaning. See Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-4 (1974).
We turn next to the determination of "public figure" status with regard to each plaintiff as resolved by the trial judge. Whether or not a person is a "public figure" in a defamation action is of considerable significance since the degree of responsibility of defendants is substantially affected by that assessment.
The constitutional guarantee of a free press, uninhibited by threat of suit, requires that "public officials" be limited in their right to recover damages for defamation to those instances where the defamatory statement was published with "malice"-that is with knowledge that the comment was false or in reckless disregard of whether or not it was false. New York Times Co. v. Sullivan, 376 U.S. 254, 279-280, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964). This was extended from "public officials" to "public figures" in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).
In Gertz the Supreme Court held that a private plaintiff in a defamation lawsuit did not have to meet the strict New York Times standard to recover damages. 418 U.S. at 347, 94 S.Ct. at 3010. Where liability without fault is not imposed, the states are free to "define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." Ibid. (footnote omitted).
*394 The responsibility to resolve the status of a person in terms of private individual or public figure, and thus subject to the New York Times test, is an arduous task requiring application of an elusive concept. It has been described as "trying to nail a jellyfish to the wall." Rosanova v. Playboy Enterprises, Inc., 411 F. Supp. 440, 443 (S.D.Ga. 1976), aff'd 580 F.2d 859 (5 Cir.1978). The United States Supreme Court in Gertz v. Welch, supra, has defined public figures as follows:
Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. [418 U.S. at 342, 94 S.Ct. at 3008]
........
For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment. [at 345, 94 S.Ct. at 3009]
........
In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions. [at 351, 94 S.Ct. at 3012]
Other jurisdictions have held that it is for the trial judge to determine whether the proofs reveal the plaintiff to be a "public official," Rosenblatt v. Baer, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966), or a "public figure." Hoffman v. Washington Post Co., 433 F. Supp. 600 (D.D.C. 1977), aff'd 578 F.2d 442 (D.C. Cir.1978); Hotchner v. Castillo-Puche, 404 F. Supp. 1041, 1045 (S.D.N.Y. 1975), rev'd on other grounds 551 F.2d 910 (2 Cir.1977). This rule lessens the possibility that a jury will use the cloak of "public figure" or "public official" to punish unpopular ideas or speakers and will assure an appellate court of the record *395 and findings required for appellate review. Rosenblatt v. Baer, supra, 383 U.S. at 88 n. 15, 86 S.Ct. at 677 n. 15. Cf. New York Times Co. v. Sullivan, supra, 376 U.S. at 285, 84 S.Ct. at 728.
No reported New Jersey decision has specifically adopted the Rosenblatt rule imposing the duty to resolve the issue on the trial judge. We agree with the trial judge here, however, that some guidance may be found in our ruling in Barbetta Agency, Inc. v. Evening News Pub. Co., Inc., 135 N.J. Super. 214, 218 (App.Div. 1975), wherein we determined that the issue of privilege is one of law to be resolved by the judge. We conclude that whether a plaintiff in a defamation suit is a public figure is also one for the judge. Similarly, although application of the statute of limitations involves questions of fact, particularly where the problem of "discovery" is involved, nevertheless, our Supreme Court has imposed the responsibility to determine applicability thereof upon the trial judge. Lopez v. Swyer, 62 N.J. 267, 274-275 (1973). Submission of such issues to a jury is awkward and may lead to confusion. As here, "[t]he decision requires more than a simple factual determination...." Id. at 275. Hence, "it should be made by a judge ... conscious of the equitable nature of the issue...." Ibid.
Our task in reviewing the trial court's determinations is not to weigh the evidence anew but rather to determine whether there was sufficient credible evidence in the record to support those determinations. State v. Johnson, 42 N.J. 146, 164 (1964). With respect to the rulings finally made on the status of each plaintiff, we conclude that there was adequate, credible evidence to support those findings. In the case of Simpson, the record adequately supports the ruling that he did not attain the degree of public recognition, notoriety or attention to be declared a public figure. In the case of Lawrence, there is sufficient evidence to support the determination that, based upon his activities as the leader of the petition campaign and association president, he was a public figure and thus must meet *396 the more stringent proof requirement upon retrial. Since the issues involved in Lawrence's claims must be dealt with in the context of his status as a public figure, to succeed he will be required to show that defendants were aware that they were circulating false information, New York Times Co. v. Sullivan, supra, 376 U.S. at 285-286, 84 S.Ct. at 728, or that the false publication was made with a "high degree of awareness of ... probable falsity." Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964); Curtis Publishing Co. v. Butts, supra, 388 U.S. at 153, 87 S.Ct. at 1990.
With regard to the verdict in favor of Simpson in the sum of $22,500, we are satisfied that the remaining assertions of error lack merit. We discern no impropriety in permitting the use of Bauer's deposition to show that he was reluctant to disclose the source of his information for the defamatory articles. Bauer was a party to the litigation and an officer of the defendant corporation which owned the newspaper. His deposition could therefore be used by the adverse party for any purpose against him or against the corporation, R. 4:16-1(b), or it could be used against him as a witness, for impeachment purposes. R. 4:16-1(a). Nor do we find any merit in defendants' attack on the charge with regard to damages. Reading the charge as a whole, we find no implication that the jury may presume damages. Allegedly objectionable portions may not be taken out of context and read in isolation. The charge must be read and considered in its entirety to determine its validity. State v. Wilbely, 63 N.J. 420, 422 (1973); State v. Council, 49 N.J. 341, 342 (1967). Considering the charge as a whole, we find it unexceptionable.
For the reasons stated, the judgment in favor of plaintiff Simpson is affirmed. We also affirm the trial court's determination that Lawrence is a public figure and the order for a new trial of his claims.
NOTES
[1] Summary judgment was previously upheld in favor of another defendant, Joseph Hartnett, because the action against him was barred by the statute of limitations. Lawrence v. Bauer Publishing & Printing Ltd., 78 N.J. 371 (1979).
[2] N.J.S.A. 2A:43-1 extends the privilege which attaches to publication of judicial proceedings to statements issued by police department heads and county prosecutors concerning investigations in progress or completed by them. If a publisher quotes or relies on other sources, he does so at his own peril.